**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**TROI GRAHAM (5),**<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CASE NO. 1:25-CR-00038-MAC-ZJH**<br><br>**HON. MARCIA A. CRONE**<br>United States District Judge |

---

**DEFENDANT TROI GRAHAM'S EMERGENCY PRO SE NOTICE OF UNDISPUTED BANK RECORD EXCULPATION AND SUPPLEMENTAL MOTION TO DISMISS INDICTMENT PURSUANT TO FED. R. CRIM. P. 12(B)(3)(A) & 12(B)(3)(B)**

---

**COMES NOW** Defendant, Troi Graham (5), appearing *Pro Se* out of constitutional necessity, and respectfully moves this Honorable Court to dismiss the Superseding Indictment with prejudice pursuant to Federal Rules of Criminal Procedure 12(b)(3)(A) and 12(b)(3)(B), the Sixth Amendment, and binding Fifth Circuit authority.

## I. MANDATORY JURISDICTIONAL STATEMENT PRESERVING NON-HYBRID EXCEPTION

> **MANDATORY NON-HYBRID EXCEPTION STATEMENT:** Defendant submits this filing *pro se* pursuant to 28 U.S.C. § 1654 and the mandatory constitutional exception under *United States v. Cronic*, 466 U.S. 648 (1984), *United States v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007), and *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973). Where court-appointed counsel Thomas J. Burbank has failed to engage in substantive motion practice for 365+ days and refused to present exculpatory records to the Court, this Court has a non-discretionary constitutional duty to consider this motion directly rather than striking it as an improper "hybrid" filing.

## II. CERTIFIED MICHIGAN BUSINESS DOMICILE & ABSOLUTE LACK OF VENUE

1. **Certified Corporate Domicile in Michigan:** Official certified incorporation filings from the State of Michigan Department of Licensing and Regulatory Affairs (LARA) conclusively establish that both **Lionsgate Business Consulting** and **My Big Sister's House** are validly registered Michigan corporate entities. All business filings, operations, and associated banking facilities are localized entirely within the State of Michigan.

2. **Fatal Venue Defect Under *Cabrales*:** The government asserts venue in the Eastern District of Texas based solely on a Texas address listed on an SBA application. However, under Article III, Section 2, Clause 3 of the United States Constitution, the Sixth Amendment, and *United States v. Cabrales*, 524 U.S. 1 (1998), constitutional venue lies exclusively in the district where the essential conduct elements of the charged offense occurred. Because zero physical, corporate, or financial acts occurred in Texas, venue in EDTX is constitutionally defective.

## III. SBA STATUTORY POLICY EXEMPTS ALLEGED TEXAS VICTIM FROM LIABILITY

3. **SBA $200,000 Personal Guarantee Statutory Policy:** Under official Small Business Administration (SBA) Economic Injury Disaster Loan (EIDL) program regulations and standard Operating Procedures (SOP 50 30), personal guarantees and individual indemnification liability apply **only to loan amounts exceeding $200,000.**

4. **Zero Personal Liability or Injury to Alleged Texas Victim:** Official loan documentation confirms the Lionsgate EIDL loan amount was $128,000. Because this loan fell well below the $200,000 statutory threshold, no personal guarantee attached by operation of federal law. Consequently, the Texas individual listed on the application suffered **zero personal liability, zero financial exposure, and zero legal injury**. The government cannot manufacture an injured victim in Texas where federal policy explicitly holds the individual harmless.

## IV. UNDISPUTED BANK RECORDS CONFIRM ZERO LOSS TO BANK OR GOVERNMENT

5. **Fifth Third Bank SAR Narrative Confirms Zero Loss:** Official Fifth Third Bank compliance records and Suspicious Activity Reports (`US CRAWFORD-00438808`) explicitly state: *"Fifth Third Bank will not sustain a loss. $208,000 of the funds are being held and will be returned to the SBA."* All funds were frozen and recovered, resulting in zero net loss to the bank or the government.

6. **Government Falsehood & Discrepancy in Indictment:** The Superseding Indictment falsely alleges that $138,000 is owed or defrauded. Bank ledger records prove the actual loan was $128,000 and that no balance remains outstanding. Materially misrepresenting the loss amount before the grand jury constitutes a fatal structural variance and a violation of Fifth Amendment Due Process.

## V. PRAYER FOR FLAT-OUT DISMISSAL WITH PREJUDICE

**WHEREFORE,** Defendant Troi Graham respectfully prays that District Judge Marcia A. Crone enter an Order:

1. **ACCEPTING and DOCKETING** this Motion *Pro Se* under 28 U.S.C. § 1654 and the constitutional exception of *United States v. Cronic*;
2. **ENTERED A FLAT-OUT DISMISSAL WITH PREJUDICE** of the Superseding Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) for failure to state an offense, absolute lack of territorial venue (*Cabrales*), and fundamental Due Process defects; or, in the alternative,
3. **TRANSFERRING** this action to the Eastern District of Michigan under Fed. R. Crim. P. 21(b).

Respectfully submitted this 30th day of October, 2026.

/s/ Troi Graham

**Troi Graham, Defendant Pro Se**
3829 Roosevelt, Dearborn, MI 48124
Phone: 517-492-4341

---

**CERTIFICATE OF SERVICE & COMPLIANCE**

I hereby certify that on October 30, 2026, a true copy of this Motion was served via Express Mail / Electronic Delivery upon AUSA, U.S. Attorney's Office — EDTX, 500 Fannin Street, Suite 3500, Beaumont, TX 77701, and Defense Counsel Thomas J. Burbank.

/s/ Troi Graham

**Troi Graham**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>TROI GRAHAM,<br>Defendant. | **CASE NO. 1:23-CR-00045-MAC**<br>JUDGE MARCIA A. CRONE |

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE, LACK OF JURISDICTION, AND FAILURE TO STATE AN OFFENSE**

Came on for consideration before the Court is the *Pro Se* Motion to Dismiss filed by Defendant Troi Graham pursuant to Federal Rules of Criminal Procedure 12(b)(2) and 12(b)(3), challenging territorial venue, jurisdictional sufficiency, and the legal integrity of the underlying loss and victim allegations.

The Court explicitly finds that the Defendant's pleadings constitute distinct, properly categorized assertions of constitutional and statutory defects under Rule 12 and may not be dismissed, recharacterized, or prejudiced by the government under any procedural label of an improper "hybrid motion."

The Court, having carefully reviewed the motion, the official records and evidentiary exhibits on file—specifically including Fifth Third Bank records establishing 100% fund return and zero actual loss, statutory EIDL non-guarantee provisions under the CARES Act, and certified Michigan LARA corporate domicile records—finds that the motion is well-taken and should be **GRANTED**.

It is therefore **ORDERED, ADJUDGED, AND DECREED** that the Indictment against Defendant Troi Graham in the above-captioned cause is hereby **DISMISSED** with prejudice for want of proper territorial venue and failure to state an offense supported by actionable financial loss or injury.

______________________________
**MARCIA A. CRONE**
UNITED STATES DISTRICT JUDGE

Ex. B-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, | ) | **CASE NO. 1:25-CR-00038-MAC-ZJH** |
| v. | ) | **HON. MARCIA A. CRONE** United States District Judge |
| **TROI GRAHAM (5),** Defendant. | ) | |

**EXHIBIT B: DECLARATION AND NOTICE OF OFFICIAL SBA COVID-19 EIDL PROGRAM GUIDELINES ($200,000 PERSONAL GUARANTEE STATUTORY WAIVER THRESHOLD)**

**I, TROI GRAHAM,** declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following official statutory policy standards are true and correct, and are hereby submitted in direct support of Defendant's Motion to Dismiss the Superseding Indictment:

**I. OFFICIAL CONGRESSIONAL RESEARCH SERVICE (CRS) REPORT FINDINGS**

1. Attached hereto as **Exhibit B-1** are true and correct excerpts from Congressional Research Service (CRS) Report R47509, entitled *"SBA COVID-19 EIDL Financial Relief: Policy Options and Considerations"* (updated May 28, 2026), prepared for Members and Committees of the United States Congress.

2. Page 4 of CRS Report R47509 explicitly sets forth the statutory underwriting standards enacted under the CARES Act (P.L. 116-136) governing COVID-19 Economic Injury Disaster Loans (EIDL):

> **CRS Report R47509, Page 4 (SBA EIDL Overview):**
> *"In response to the COVID-19 pandemic and an increase in demand for EIDL, the CARES Act addressed anticipated delays in EIDL application loan processing by authorizing the SBA Administrator to...* ***waive any rules related to the personal guarantee on advances and loans of not more than $200,000..."***

**II. ABSOLUTE LACK OF PERSONAL LIABILITY OR LEGAL INJURY TO TEXAS INDIVIDUAL**

3. **Statutory Insulation from Personal Liability:** Under federal law and official SBA EIDL program guidelines, loans of $200,000 or less carried an automatic statutory waiver of personal guarantees. Corporate debt at or below this threshold attached solely to the corporate entity, completely insulating individual corporate officers or named applicants from personal debt liability or personal asset exposure.

4. **Lionsgate Loan Amount ($128,000) Falls Below Threshold:** The official loan documentation for Lionsgate Business Consulting confirms that the total loan amount was **$128,000**—safely below the $200,000 statutory personal guarantee threshold.

5. **Destruction of Prosecution's "Texas Victim" Theory:** Because the $128,000 loan was exempt from personal guarantees by operation of federal law, the Texas resident listed on the corporate application incurred **zero personal financial liability, zero risk to personal assets, and zero legal injury**. The prosecution cannot manufacture an injured personal victim in Texas to salvage territorial venue where federal statutory policy explicitly held the individual harmless.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 30th day of October, 2026.

Exibit B2

Congressional Research Service
Informing the legislative debate since 1914

# SBA COVID-19 EIDL Financial Relief: Policy Options and Considerations

Updated May 28, 2026

Congressional Research Service
https://crsreports.congress.gov
R47509

Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R47509

May 28, 2026

# SBA COVID-19 EIDL Financial Relief: Policy Options and Considerations

**Bruce R. Lindsay, Coordinator**
Specialist in American National Government

**Anthony A. Cilluffo**
Analyst in Public Finance

**Darryl E. Getter**
Specialist in Financial Economics

**Adam G. Levin**
Analyst in Economic Development Policy

**Daniela E. Lacalle**
Research Assistant

Congress took several actions to provide financial relief to individuals, businesses, and nonprofits after the onset of the COVID-19 pandemic, including passing the Coronavirus Aid, Relief, and Economic Security Act (CARES Act; P.L. 116-136) in March 2020. The CARES Act made numerous changes to the Small Business Administrations's (SBA) programs, including expanding eligibility for Economic Injury Disaster Loans (EIDLs). SBA EIDLs are a type of disaster loan made directly to businesses and nonprofit organizations to cover operating expenses including fixed debts, payroll, accounts payable, and other bills that cannot be paid because of the disaster's economic impact. The CARES Act also authorized advance payments known as *Emergency EIDL Grants* (also referred to as "advances"). In contrast to EIDLs, which must be repaid in full, Emergency EIDL Grants did not require repayment. SBA's Emergency EIDL Grants were limited to $1,000 per employee, up to a maximum of $10,000.

Later that same year, Congress passed P.L. 116-260, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Division N, Title III of the Consolidated Appropriations Act of 2021, hereinafter the Economic Aid Act), enacted on December 27, 2020, establishing the Targeted Economic Injury Disaster Loan Advance (grant) program. The program provided a $10,000 advance payment to borrowers located in low-income communities suffering a revenue loss greater than 30% over specified time periods and had no more than 300 employees. By statute, SBA was required to provide first priority in awarding the grants to eligible borrowers located in low-income communities that had already received an Emergency EIDL advance payment below the $10,000 maximum, and second priority to eligible first-time applicants located in low-income communities.

The demand for SBA COVID EIDLs, including the Emergency EIDL Grants and the Targeted EIDLs, was significant. According to a report issued by the SBA Office of Inspector General, SBA received 27.7 million applications for SBA COVID EIDLs by December 31, 2021. On January 1, 2022, SBA stopped accepting applications for both new SBA COVID EIDLs and Emergency EIDL Grants. As of May 6, 2022, SBA's COVID EIDL funds had been exhausted and SBA stopped accepting SBA COVID EIDL increase requests or requests for reconsideration. SBA closed the online SBA COVID EIDL application portal on May 16, 2022. In total, SBA approved over 3.9 million COVID EIDLs totaling over $378.4 billion; disbursed 5,781,390 Emergency EIDL Grants totaling $20 billion; disbursed 601,058 Targeted EIDL Advance payment grants totaling over $5.2 billion; and disbursed 453,417 Supplemental Targeted EIDL Advance payment grants totaling over $2.3 billion.

SBA deferred repayment for all SBA COVID EIDLs approved in calendar years 2020-2022 to 30 months from the date of the note. Additionally, SBA implemented a program called the Hardship Accommodation Plan (HAP) in November of 2022. HAP offered temporary relief to struggling businesses by temporarily reducing payment amounts. SBA ended HAP on March 19, 2025, but SBA COVID EIDL borrowers may still apply for temporary financial relief allowing them to reduce their payments by 50% for six months. Neither HAP, nor the current policy of reducing payments by 50% for six months cancel the borrower's debt. The borrower must resume full payments after the deferral, and interest continues to accrue during the deferral.

As the SBA COVID EIDL program pivots to the repayment phase, indications that some borrowers are struggling to pay off their loans have surfaced. For example, through the end of the third quarter of FY2025 (June 30, 2025), SBA had charged-off (formally recognizing that additional repayment and recoveries are unlikely) $75.2 billion in SBA COVID EIDLs. In 2026, SBA began sending defaulted COVID EIDLs to the Department of the Treasury and the Department of Justice for enhanced debt collection. These activities include offsetting (reducing) federal payments, such as Social Security benefits and income tax refunds, to defaulted borrowers; administrative wage garnishment; and potential litigation. These recovery actions have led to an increase in constituent questions about debt collection, as well as an increase in congressional interest around financial relief options.

Current congressional discussions about the need for additional financial relief for those borrowers include policy options such as (1) reduced interest rates, (2) loan deferments without accrued interest, (3) grant assistance, and (4) loan forgiveness.

Exhibit B4

Proponents of providing financial relief to SBA COVID EIDL borrowers might argue that these financial relief options could help struggling businesses specifically, and help the national economy broadly, because failing businesses can have rippling effects on other businesses, industries, and sectors. Opponents of these options might argue that providing financial relief to SBA COVID EIDL borrowers could promote moral hazard and create repetitive financial relief for a single incident. They may further argue that these financial relief options deviate from the historical approach of providing businesses with disaster *loans* rather than grants, the latter of which increases cost to the taxpayer. They may also argue that the financial relief options, such as those summarized in this report, could compromise SBA's ability to fund disaster loans for current and future disasters at current levels of program funding.

Exhibit 85

# Contents

Introduction ..... 1
SBA EIDL Overview ..... 3
SBA COVID EIDL Maximum Loan Amounts and Program Termination ..... 4
SBA COVID EIDL Amounts and Related Grant Activity ..... 4
SBA COVID EIDL Hardship ..... 5
SBA COVID EIDL Payment Deferrments ..... 5
SBA Hardship Accommodation Plan and Available Alternatives ..... 6
SBA COVID EIDL Charge-Off Activity ..... 7
SBA COVID EIDL Debt Collection ..... 9
Treasury Offset Program ..... 9
Treasury Cross-Servicing ..... 10
Department of Justice ..... 11
SBA COVID EIDL Financial Relief Policy Options ..... 11
Loan Forgiveness ..... 12
SBA COVID EIDL Forgiveness Strategies ..... 12
SBA COVID EIDL Deferments ..... 14
SBA COVID EIDL Interest Rates ..... 14
Grant Assistance ..... 15
Needs-Based Financial Relief Vs. Blanket Financial Relief ..... 16
Financial Relief Implications and Considerations ..... 16
Equity Concerns ..... 16
Cost Concerns ..... 17
Waste, Fraud, and Abuse ..... 19
Implications for Subsidy Rates ..... 19
Funding the SBA Disaster Loan Account ..... 21
Moral Hazard ..... 22
Duplicative Financial Relief for a Single Incident ..... 22
Potential Competitive Advantages ..... 22
Concluding Observations ..... 23

# Figures

Figure 1. COVID-19 EIDLs and Related Grants, Dollar Amount and Number Disbursed ..... 5
Figure 2. Number of COVID EIDLs by Loan Size ..... 13
Figure 3. Aggregate COVID EIDL Dollar Amount by Loan Size ..... 18
Figure 4. Number of COVID EIDLs and Aggregate COVID EIDL Dollar Amount Percentages by Loan Size ..... 18
Figure 5. Credit Subsidy Rates for Selected SBA Programs ..... 21

Figure B-1. SBA COVID-19 Relief Programs ..... 27

## Tables

Table 1. SBA COVID EIDL Unpaid Principal Balance and Charge-Offs ..... 8
Table 2. SBA COVID EIDL ..... 12
Table 3. SBA Disaster Loans in Response to Natural Disasters ..... 17

## Appendixes

Appendix A. Overview of SBA Paycheck Protection Program (PPP) ..... 24
Appendix B. Federal Business Disaster Assistance: Historical Developments ..... 25
Appendix C. Loan Forgiveness Examples ..... 28

## Contacts

Author Information ..... 29

Exhibit B7

# Introduction

Since 1953, the U.S. Small Business Administration (SBA) has administered several types of direct disaster loans to small businesses, nonprofit organizations, homeowners, and renters. The SBA Disaster Loan Program currently comprises four major lending programs:

1. Real Property Disaster Loans for households;
2. Personal Property Disaster Loans for households;
3. Physical Disaster Business Loans for businesses of all sizes, often called Business Physical Disaster loans; and
4. Economic Injury Disaster Loans (EIDLs) for small businesses and private nonprofit organizations.[1]

Congressional interest in the SBA Disaster Loan Programs has increased in recent years, primarily because small businesses are viewed as a means to stimulate economic activity and create jobs. Congressional interest became especially acute as the COVID-19 pandemic caused widespread adverse economic impact, which included domestic productivity losses, supply chain disruptions, major labor dislocations, and significant financial pressure on both businesses and households. Congress passed several bills to address the pandemic's adverse impacts, including P.L. 116-136, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), enacted on March 27, 2020.

The CARES Act greatly expanded eligibility for SBA EIDLs, to include, for the first time, specified types of nonprofit organizations.[2] Eligible small businesses and nonprofit organizations suffering economic hardship could use SBA EIDLs for operating expenses such as employee salaries, lease or mortgage payments, and utility payments. SBA COVID EIDLs were offered at an interest rate of 3.75% for small businesses and 2.75% for nonprofit organizations.[3] The loan terms were up to 30 years for repayment.

> **SBA COVID EIDL**
>
> **Loan Terms:** 30 years for repayment
>
> **Nonprofit Organization Interest Rate:** 2.75%
>
> **Small Business Interest Rate:** 3.75%
>
> **SBA Emergency EIDL Grant:** $1,000 per employee, up to a maximum of $10,000

The CARES Act also authorized the SBA Administrator to provide Emergency EIDL Grants up to $10,000 as an "advance" payment in the amount requested within three days after receiving an EIDL application from an eligible entity. Applicants could use the advances while loans were being processed and were not required to repay the Emergency EIDL Grant—even if the applicant was subsequently denied an SBA COVID EIDL. Due to anticipated demand, SBA limited the Emergency EIDL Grants to $1,000 per employee, up to a maximum of $10,000.

Later that year, P.L. 116-260, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Division N, Title III of the Consolidated Appropriations Act of 2021, hereinafter the Economic Aid Act), enacted on December 27, 2020, established the Targeted Economic Injury

---

[1] For more information about SBA disaster loans, see CRS Report R44412, *SBA Disaster Loan Program: Frequently Asked Questions*, by Bruce R. Lindsay.

[2] The expanded eligibility critieria authorized by Congress only applied only to SBA COVID EIDL. The eligibilty requirements for other disasters were not changed. For more information about the steps SBA took to meet pandemic assistance demand, see CRS Report R47694, *SBA as a Vehicle for Crisis Relief: Lessons from the COVID-19 Pandemic*, coordinated by Adam G. Levin.

[3] For more information about SBA disaster loan interest rates, see CRS Report R46963, *SBA Disaster Loan Interest Rates: Overview and Policy Options*, by Bruce R. Lindsay et al.

Exhibit B8

Disaster Loan Advance (grant) program. The Targeted EIDL program was similar to Emergency EIDL Grants, but was only available to businesses in certain areas and had other restrictions on its use. The Targeted EIDL program provided a $10,000 advance payment to borrowers located in low-income communities that had suffered a revenue loss greater than 30% over specified time periods and had no more than 300 employees. SBA was required to provide first priority in awarding the grants to eligible borrowers located in low-income communities that had already received an Emergency EIDL advance payment below the $10,000 maximum, and second priority to eligible first-time applicants located in low-income communities.

On January 1, 2022, SBA stopped accepting applications for new SBA COVID EIDLs, and as of May 6, 2022, SBA had exhausted COVID EIDL funds and stopped accepting requests for COVID EIDL increases. SBA then pivoted to receiving SBA COVID EIDL payments. Though SBA offered COVID EIDL deferments to provide borrowers financial relief, some businesses and nonprofit organizations are still struggling to make SBA COVID EIDL payments.

SBA implemented a program called the Hardship Accommodation Plan (HAP) in November of 2022.[4] HAP offered temporary relief to struggling businesses by temporarily reducing payment amounts. SBA ended HAP on March 19, 2025, but SBA COVID EIDL borrowers may still apply for temporary financial relief allowing them to reduce their payments by 50% for six months. Neither HAP nor the current policy of reducing payments by 50% for six months cancel the borrower's debt. The borrower must resume full payments after the deferral, and interest continues to accrue during the deferral.

In early 2026, SBA took several actions to increase debt collection on defaulted COVID EIDLs. As reported by the SBA Office of Inspector General, SBA's temporary permission to continue servicing defaulted COVID EIDLs expired on March 31, 2026.[5] Following that date, the SBA reported sending 562,000 pandemic-era loans (COVID EIDLs and Paycheck Protection Program loans) worth $22 billion to the Department of the Treasury (Treasury) and Department of Justice for enhanced debt collection.[6] After being transferred, defaulted borrowers may be subject to having federal payments (such as Social Security benefits and federal income tax refunds) offset (reduced), administrative wage garnishment, and potential litigation.[7] These recovery actions have led to an increase in constituent questions about debt collection as well as an increase in congressional interest around financial relief options.

Congressional concern about SBA COVID EIDL hardship has prompted some to investigate potential policies that would provide financial relief to businesses and nonprofit organizations (hereinafter "applicants" or "borrowers") including lower interest rates, loan forgiveness, and extended repayment deferrals that do not accrue interest.

[4] U.S Small Business Administrsation, *COVID-19 Economic Injury Disaster Loan Servicing Capability*, Report 25-16, May 29, 2025, p. 9, https://www.oversight.gov/sites/default/files/documents/reports/2025-05/SBA%20OIG%20Report%2025-16.pdf.

[5] Under the Debt Collection Improvement Act, federal agencies (including SBA) are required to send defaulted debts to the Department of the Treasury (Treasury)'s Cross-Servicing program. SBA received a two-year waiver from Treasury for this requirement in April 2024, which expired on March 31, 2026. SBA Office of Inspector General, "SBA's Collection Efforts on Delinquent COVID-19 EIDLs," Report 25-23, August 12, 2025, p. 4, https://www.sba.gov/document/report-25-23-sbas-collection-efforts-delinquent-covid-19-eidls.

[6] SBA, "SBA Sends 562,000 Suspected Fraudulent Loans to Treasury for Collections Totaling $22 Billion," News Release 26-47, April 24, 2026, https://www.sba.gov/article/2026/04/24/sba-sends-562000-suspected-fraudulent-loans-treasury-collections-totaling-22-billion.

[7] For Treasury's debt collection tools, see Department of the Treasury, Bureau of the Fiscal Service, "Cross-Servicing," last updated March 26, 2026, https://fiscal.treasury.gov/debt-management/cross-servicing.

Exhibit B9

This report begins with an overview of SBA EIDL and SBA COVID EIDL maximum loan amounts. The report then discusses potential indications of SBA COVID EIDL hardship and describes SBA COVID EIDL deferral policies. The report then discusses potential policy options that may provide financial relief to SBA COVID EIDL borrowers. The report concludes with a discussion about the potential policy implications associated with financial relief policy options.

# SBA EIDL Overview

SBA EIDL is a long-standing disaster loan program authorized in 1953 by Section 7(b) of the Small Business Act. SBA EIDLs are direct loans (meaning they are not provided by third party lenders) that provide up to $2 million for operating expenses including fixed debts, payroll, accounts payable, and other bills that cannot be paid because of the disaster's impact.[8] SBA EIDLs help eligible small businesses, small agricultural cooperatives, small businesses engaged in aquaculture, and most types of nonprofit organizations meet their financial obligations and operating expenses that cannot be met as a direct result of the disaster.[9]

SBA EIDL amounts are based on actual economic injury and financial needs, regardless of whether the business or eligible nonprofit suffered any property damage. If an applicant is a major source of employment, SBA may waive the $2 million statutory loan limit.[10] In addition, EIDL proceeds cannot be used to refinance long-term debt, expand facilities, pay dividends or bonuses, or provide for relocation expenses.[11]

To be eligible for an EIDL, applicants must have a credit history acceptable to SBA, the ability to repay the loan, and pledge collateral for EIDLs greater than $25,000.[12] SBA collateralizes real estate or other assets when available, but it will not deny a loan for lack of collateral.[13]

SBA EIDL interest rates are determined by formulas established in law and are fixed for the life of the loan. EIDL interest rate ceilings are statutorily set at 4% per annum. EIDL applicants are not eligible if SBA determines that the applicant has credit available elsewhere.

SBA EIDL can have maturities up to 30 years. SBA determines an appropriate installment payment based on each borrower's financial condition, which, in turn, determines the loan term.[14] There are no prepayment penalties.

In response to the COVID-19 pandemic and an increase in demand for EIDL, the CARES Act addressed anticipated delays in EIDL application loan processing by authorizing the SBA Administrator to

---

[8] Due to unprecedented demand, in March 2020, SBA lowered the maximum COVID-19 EIDL amount from $2 million to $500,000, and, on May 3, 2020, reduced it to $150,000. On April 6, 2021, SBA increased the maximum COVID-19 EIDL to $500,000. On September 9, 2021, SBA increased the EIDL borrowing limit to $2 million from $500,000 (effective October 8, 2021).

[9] U.S. Small Business Administration, "Fact Sheet—Economic Injury Disaster Loans, California Declaration #16332," March 19, 2020, at https://disasterloan.sba.gov/ela/Declarations/DeclarationDetails?declNumber=3485&direct=false (hereinafter cited as SBA, "Fact Sheet").

[10] Ibid.

[11] For the full list of ineligible uses of EIDL loan proceeds, see SBA, "Disaster Assistance Program SOP," pp. 75-76.

[12] In 2024, SBA increased the unsecured loan limit to $50,000. However, the COVID EIDL program stopped accepting new loan and loan modification applications before then, so the $25,000 limit applied to COVID EIDLs. SBA, "Disaster Assistance Loan Program Changes to Unsecured Loan Amounts and Credit Elsewhere Criteria," 89 *Federal Register* 59826, July 24, 2024, https://www.federalregister.gov/d/2024-16207.

[13] U.S. Small Business Administration, "Fact Sheet."

[14] Ibid.

Exhibit B10

- waive the "credit not available elsewhere" requirement;
- approve an applicant based solely on their credit score;
- waive any rules related to the personal guarantee on advances and loans of not more than $200,000; and
- waive the requirement that the applicant needs to be in business for the one-year period before the disaster declaration (except that no waiver may be made for a business that was not in operation on January 31, 2020).

## SBA COVID EIDL Maximum Loan Amounts and Program Termination

As mentioned previously, the maximum loan amount provided for SBA EIDLs is $2 million. The maximum loan amount for SBA COVID EIDLs, however, fluctuated due to budgetary concerns. Some key changes to SBA COVID EIDL maximum loan amounts included

- SBA reduced the maximum loan amount to $150,000 on May 3, 2020;
- SBA increased the maximum loan amount from $150,000 to $500,000 on March 24, 2021 (effective as of April 6, 2021);[15] and
- SBA increased the maximum loan amount from $500,000 to $2 million on September 9, 2021 (effective as of October 8, 2021).[16]

On January 1, 2022, SBA stopped accepting applications for new SBA COVID EIDL and Emergency EIDL Grants. As of May 6, 2022, SBA's COVID EIDL funds were exhausted and SBA stopped accepting SBA COVID EIDL loan increase requests. SBA closed the online SBA COVID EIDL application portal on May 16, 2022.

### SBA COVID EIDL Amounts and Related Grant Activity

As mentioned previously, demand for SBA COVID EIDLs, including Emergency EIDL Grants and Targeted EIDLs, was signifigant and unprecedented. SBA approved over 3.9 million EIDLs totaling over $378.4 billion; disbursed 5,781,390 EIDL Grants totaling $20 billion; disbursed 601,058 Targeted EIDL Advance payment (grants) totaling over $5.2 billion; and disbursed 453,417 Supplemental Targeted EIDL Advance payment (grants) totaling over $2.3 billion.[17]

**Figure 1** presents the total number of loans or grants/advances provided by SBA, as well as the total amount of money provided by SBA for each type of loan or grant/advance.

---

[15] U.S. Small Business Administration, "SBA to Increase Lending Limit for COVID-19 Economic Injury Disaster Loans," March 24, 2021, at https://www.sba.gov/article/2021/mar/24/sba-increase-lending-limit-covid-19-economic-injury-disaster-loans.

[16] U.S. Small Business Administration, "SBA Administrator Guzman Enhances COVID Economic Injury Disaster Loan Program to Aid Small Businesses Facing Challenges from Delta Variant," September 9, 2021, at https://www.sba.gov/article/2021/sep/09/sba-administrator-guzman-enhances-covid-economic-injury-disaster-loan-program-aid-small-businesses; and SBA, "SBA Administrator Guzman Announces Key Policy Change: Existing COVID Economic Injury Disaster Loan Program Borrowers to Receive an Additional Deferment," March 15, 2022, at https://www.sba.gov/article/2022/mar/15/sba-administrator-guzman-announces-key-policy-change-existing-covid-economic-injury-disaster-loan.

[17] U.S. Small Business Administration, "Disaster Assistance Update Nationwide SBA COVID EIDL, Targeted EIDL Advances, Supplemental Targeted Advances, April 28, 2022 (figures as of April 27, 2022)," https://www.sba.gov/document/report-covid-19-eidl-reports-2022 and SBA, "SBA Disaster Assistance Update EIDL Advance/COVID-19," https://www.sba.gov/document/report-covid-19-eidl-advance-reports-2020.

Exhibit B11

**Figure 1. COVID-19 EIDLs and Related Grants, Dollar Amount and Number Disbursed**




**Sources:** U.S. Small Business Administration, "Disaster Assistance Update Nationwide SBA COVID EIDL, Targeted EIDL Advances, Supplemental Targeted Advances, April 28, 2022 (figures as of April 27, 2022)," https://www.sba.gov/document/report-covid-19-eidl-reports-2022; SBA, "Disaster Assistance Updated (figures as of July 15, 2020)," https://www.sba.gov/sites/default/files/2021-02/EIDL%20COVID-19%20Advance%207.15.20-508.pdf.

# SBA COVID EIDL Hardship

Establishing the extent to which borrowers struggle to repay SBA COVID EIDLs is difficult and most reports of hardship have been anecdotal.[18] Nevertheless, one potential indicator of hardship is the reported SBA charge-off rate. SBA defines charge-off as "the process by which SBA recognizes a loss and removes the uncollectible loan account from its active receivable accounts."[19] This is a separate event from default—typically, a loan would be in default for some time before being charged-off. SBA COVID EIDLs may be considered "too young" to determine aggregate charge-offs because SBA COVID EIDLs were granted a series of deferals. Given that the extended deferral period delayed many SBA COVID EIDLs from defaulting, estimating the loan charge-off rate for the program is challenging.

## SBA COVID EIDL Payment Deferrments

SBA has offered deferrments to help businesses struggling to make SBA COVID EIDL payments. Under present law and regulations, the first payment on an SBA EIDL is normally due five

[18] There have been news reports that SBA COVID EIDL accrued interest is cost prohibitive to some businesses, and some business owners have complained that EIDL payments are not going toward the loan principal. See "'This is the last thing we need:' Millions of businesses hammered by the pandemic need to start paying back Covid loan," *CNN Business*, January 13, 2023.

[19] U.S. Small Business Administration, *SBA Charge Off Procedures Summary and Suggested Wrap-Up Report*, https://www.sba.gov/sites/default/files/bank_wrapup_report.pdf.

Exhibit B12

months after disbursement. However, on March 23, 2020, SBA announced that it would provide additional time to businesses with regard to their first EIDL payment by deferring payments on existing disaster loans through December 31, 2020. SBA announced that this was "to help borrowers during this unprecedented time," and also announced that payments on new EIDLs would be deferred for one year (although interest would continue to accrue).[20]

On March 12, 2021, SBA extended the deferment period for all SBA COVID-19-related EIDL and other disaster loans until 2022. Specifically, all disaster loans made in calendar year 2020 had a first payment due date extended from 12 months to 24 months from the date of the note, and all disaster loans made in calendar year 2021 had a first payment due date extended from 12 months to 18 months from the date of the note.[21]

On September 9, 2021, SBA announced a further deferral of SBA COVID EIDL payments for 24 months after loan origination to help small businesses "get through the pandemic without having to worry about making ends meet."[22] Additionally, on March 15, 2022, SBA extended the deferral period for all COVID-19 EIDL approved in calendar years 2020-2022 to 30 months from the date of the note (interest continues to accrue).[23]

On May 7, 2024, SBA announced that the 30-month COVID-19 EIDL deferment period would not be extended.[24]

Further, on March 15, 2022, SBA extended the deferral period for all SBA COVID EIDLs approved in calendar years 2020-2022, to 30 months from the date of the note (interest continued to accrue).[25] For example, a 30-month deferral period for an SBA COVID EIDL issued in December 2022 would extend deferred payments through June 2025. At this time, all COVID EIDLs have entered repayment. However, loans made near the end of the program have been in repayment for a relatively short period of time. Given this limitation, it is challenging to estimate the lifetime performance of these loans given their limited repayment history.

## SBA Hardship Accommodation Plan and Available Alternatives

In addition to the SBA COVID EIDL deferments described above, SBA offered a Hardship Accommodation Plan (HAP) for borrowers experiencing short-term financial challenges. The plan allowed eligible borrowers to make reduced payments for six months. Interest on the loan

---

[20] U.S. Small Business Administration, "Carranza Implements Automatic Deferment on Existing SBA Disaster Loans Through End of 2020," March 23, 2020, https://www.sba.gov/about-sba/sba-newsroom/press-releases-media-advisories/carranza-implements-automatic-deferment-existing-sba-disaster-loans-through-end-2020.

[21] U.S. Small Business Administration, "SBA Extends Deferment Period for all COVID-19 EIDL and Other Disaster Loans until 2022," March 12, 2021.

[22] U.S. Small Business Administration, "SBA Administrator Guzman Enhances COVID Economic Injury Disaster Loan Program to Aid Small Businesses Facing Challenges from Delta Variant," September 9, 2021, https://www.sba.gov/article/2021/sep/09/sba-administrator-guzman-enhances-covid-economic-injury-disaster-loan-program-aid-small-businesses.

[23] U.S. Small Business Administration, "SBA Administrator Guzman Announces Key Policy Change: Existing COVID Economic Injury Disaster Loan Program Borrowers to Receive an Additional Deferment," March 15, 2022, https://www.sba.gov/article/2022/mar/15/sba-administrator-guzman-announces-key-policy-change-existing-covid-economic-injury-disaster-loan.

[24] U.S. Small Business Administration, *Manage your EIDL*, May 7, 2024, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/covid-19-economic-injury-disaster-loan/manage-your-eidl.

[25] U.S. Small Business Administration, "SBA Administrator Guzman Announces Key Policy Change: Existing COVID Economic Injury Disaster Loan Program Borrowers to Receive an Additional Deferment," March 15, 2022, https://www.sba.gov/article/2022/mar/15/sba-administrator-guzman-announces-key-policy-change-existing-covid-economic-injury-disaster-loan.

Exhibit B13

continues to accrue, which could increase, or create, a balloon payment due at the end of the loan term. Borrowers were eligible to enroll in HAP beginning 60 calendar days before their first payment due date. The loan terms for HAP were as follows:

- borrowers are required to pay at least 10% of their monthly payment amount for six months;
- during the Hardship Accommodation period, borrowers can voluntarily make larger payments;
- the regular monthly payment amount will resume and will be required after the six-month accommodation period ends; and
- borrowers may be able to renew the Hardship Accommodation Plan.[26]

In February 2024, SBA expanded the eligibility for HAP for borrowers who were struggling with loan payments, including borrowers who were not current on the loan, those already in default but not been referred to Treasury for collection, and those that had previously participated in HAP.[27] SBA ended HAP on March 19, 2025.

SBA COVID EIDL borrowers meeting certain criteria are still eligble for temporary financial relief. SBA offers payment assistance by allowing eligible SBA COVID EIDL borrowers to reduce their payments by 50% for six months. Eligible borrowers may make use of the program once every five years.

Eligibility for temporary SBA COVID EIDL relief includes

- the loan must be less than 90 days past due at the time of the request;
- the loan must not have a Charged Off or Uncollectible status;
- the business must be actively open and operating;
- the borrower and all owners must not be subject to active bankruptcy proceedings; and
- the request for temporary financial relief must be due to a temporary financial difficulty or cash flow issue rather than a long-term challenge.

Interest is not waived during the reduced payment period. Interest continues to accrue on the outstanding loan balance, and will result in an increased balloon payment at the end of the loan term period. Full payments are required after the six-month period has been completed.[28]

## SBA COVID EIDL Charge-Off Activity

There are some early indications of increasing SBA COVID EIDL charge-off activity. A charge-off is an administrative and accounting action that SBA takes when it formally removes a loan from its active portfolio. It is a recognition that additional payments and recoveries are unlikely, not cost effective, or legally uncollectible. **Table 1** shows the amount of unpaid principal balance (UPB) and charge-offs in the SBA COVID EIDL program from FY2022 through the end of the first three quarters of FY2025 (June 30, 2025). From the end of FY2022 to the end of FY2023,

---

[26] Ibid.

[27] U.S. Small Business Administration, "Small Business Administration Announces Further Action to Help PPP and COVID EIDL Borrowers," Archived News Release 24-01, January 5, 2024, https://www.sba.gov/article/2024/01/05/small-business-administration-announces-further-action-help-ppp-covid-eidl-borrowers.

[28] U.S. Small Business Administration, *Manage Your EIDL*, April 1, 2026, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/covid-19-economic-injury-disaster-loan/manage-your-eidl.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**TROI GRAHAM (5),**<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CASE NO. 1:25-CR-00038-MAC-ZJH**<br><br>**HON. MARCIA A. CRONE**<br>United States District Judge |

## EXHIBIT A: DECLARATION AND NOTICE OF UNDISPUTED BANK TRANSACTION RECORD CONFIRMING $128,800.00 DEPOSIT (US CRAWFORD-00438875)

**I, TROI GRAHAM**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following official bank transaction records are true and correct, and are hereby submitted in direct support of Defendant's Motion to Dismiss the Superseding Indictment:

### I. OFFICIAL FIFTH THIRD BANK DISCOVERY RECORD (US CRAWFORD-00438875)

1. Attached hereto as **Exhibit A-1** is a true and correct copy of the official Fifth Third Bank, N.A. transaction record for Business Standard Checking Account No. 7933106689 in the name of Lionsgate Consulting C, produced in government discovery as **US CRAWFORD-00438875**.

2. The official bank record documents the exact transaction details as follows:

```
FIFTH THIRD BANK, N.A. | US CRAWFORD-00438875
Account: BUS STANDRD CK (DDA) 7933106689 | Current Account: $0.00 | Available:
$0.00
Date Posted: 06/30/2020 | Amount: $128,800.00
Description: SBAD TREAS 310 MISC PAY 304057800673000 Lionsgate Consulting C
```

### II. LEGAL AND FACTUAL RELEVANCE TO DEFENDANT'S MOTION TO DISMISS

3. **Definitive Proof of Loan Amount Under $200,000:** The bank record confirms that the actual transaction amount was **$128,800.00**, establishing beyond dispute that the loan was under $200,000. Under official SBA policy (CRS Report R47509, p. 4), personal guarantees were automatically waived for loans at or below $200,000, insulating individual representatives from personal liability.

4. **Corroboration of Zero Financial Loss:** The account header documents `Current Account: $0.00` and `Available: $0.00`, fully supporting Fifth Third Bank SAR record **US CRAWFORD-00438808**, which confirms that all funds were frozen and returned in full to the Small Business Administration, resulting in zero actual monetary loss.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 30th day of October, 2026.

/s/ Troi Graham

**Troi Graham, Defendant Pro Se**

| Src | Trace #/Seq | Serial # | Date Posted | Amount | +/- | Description |
|---|---|---|---|---|---|---|
| | | | 06/30/2020 | $128,800.00 | | **** DAILY BALANCE **** |
| A | 01846734 | | 06/30/2020 | $128,800.00 | + | SBAD TREAS 310 MISC PAY 304057800673000 Lionsgate Consulting C RMT*CT*3040578006 200 27625 F8142******** 063020 |

Exhibit A2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**TROI GRAHAM (5),**<br>Defendant. | ) | **CASE NO. 1:25-CR-00038-MAC-ZJH**<br><br>**HON. MARCIA A. CRONE**<br>United States District Judge |

**EXHIBIT C: DECLARATION AND NOTICE OF CERTIFIED MICHIGAN CORPORATE DOMICILE AND BUSINESS LONGEVITY**

**I, TROI GRAHAM**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following official statutory policy standards and public records are true and correct, and are hereby submitted in direct support of Defendant's Motion to Dismiss the Superseding Indictment:

**I. OFFICIAL MICHIGAN LARA CORPORATE FILINGS**

1. Attached hereto as **Exhibit C-1** are true and correct copies of the certified Articles of Incorporation for **My Big Sister's House** (Document No. BF19886435-1), filed with the Michigan Department of Licensing and Regulatory Affairs (LARA) on **May 7, 2014**, and executed by Declarant on January 28, 2014.

2. Attached hereto as **Exhibit C-2** are true and correct copies of the certified Articles of Incorporation for **Lionsgate Business Consulting Company** (Document No. BF21063926-1 / ID: 802136307), filed with Michigan LARA on **December 13, 2017**, and submitted on November 30, 2017.

**II. REFUTATION OF GOVERNMENT'S "SHELL ENTITY" FRAUD THEORY**

3. The official certified public records from the State of Michigan conclusively prove that both corporate entities were legally formed, organized, and domiciled in Michigan years prior to the COVID-19 pandemic (2014 for My Big Sister's House and 2017 for Lionsgate Business Consulting Company).

4. These state-certified records directly refute the prosecution's theory that these entities were fictitious shell corporations created for the purpose of a pandemic loan scheme, and directly corroborate Fifth Third Bank's internal investigative notes (Discovery Record US CRAWFORD-00438808) confirming multi-year business longevity dating back to 2014.

**III. DESTRUCTION OF TEXAS TERRITORIAL VENUE**

5. Both entities are domestic Michigan corporations with registered offices in Oakland and Wayne Counties. All formation, administrative, and corporate activities occurred within the State of Michigan.

6. Under Article III, Section 2 of the U.S. Constitution, Rule 18 of the Federal Rules of Criminal Procedure, and *United States v. Cabrales*, 524 U.S. 1 (1998), the government cannot establish territorial venue in the Eastern District of Texas for lawful corporate activities conducted entirely by legitimate, pre-existing Michigan corporations.

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 30th day of October, 2026.

/s/ Troi Graham

**Troi Graham, Defendant Pro Se**

Filed by Corporations Division Administrator Filing Number: 201705916490 Date: 12/13/2017

Exhibit C2

LARA Corporations Online Filing System
Department of Licensing and Regulatory Affairs

Form Revision Date 07/201

# ARTICLES OF INCORPORATION

**For use by DOMESTIC PROFIT CORPORATION**

*Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned executes the following Articles:*

---

## ARTICLE I

The name of the corporation is:

LIONSGATE BUSINESS CONSULTING COMPANY

---

## ARTICLE II

Unless the articles of incorporation otherwise provide, all corporations formed pursuant to 1972 PA 284 have the purpose of engaging in any activity within the purposes for which corporations may be formed under the Business Corporation Act. You may provide a more specific purpose:

---

## ARTICLE III

**1. State the total authorized shares of each class of stock that the corporation is authorized to issue. All corporations must authorize stock.*** If there is more than one class or series of shares, state the relative rights, preferences and limitations of the shares of each class in Article III(2).

| Class of Stock | Total authorized number of shares |
|---|---|
| COMMON | 5,000 |

2. A statement of all or any of the relative rights, preferences and limitations of the shares of each class is as follows:

EQUAL VOTING RIGHTS

---

## ARTICLE IV

The street address of the registered office of the corporation and the name of the resident agent at the registered office (P.O. Boxes are not acceptable):

1. Agent Name: JONETTE CARGILE
2. Street Address: 24061 ROSEWOOD
   Apt/Suite/Other:
   City: OAK PARK
   State: MI Zip Code: 48237
3. Registered Office Mailing Address:
   P.O. Box or Street Address:
   Apt/Suite/Other:
   City:
   State: Zip Code:

---

Exhibit C3

**ARTICLE V**

The name(s) and address(es) of the incorporator(s) is (are) as follows:

| Name | Residence or Business Address |
|---|---|
| EDWARD TAYLOR | 8116 WARD DETROIT, MI 48228 USA |

Signed this 30th Day of November, 2017 by the incorporator(s).

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Edward taylor | Incorporator | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

j Decline j Accept

# *MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS*

## *FILING ENDORSEMENT*

***This is to Certify that the*** ARTICLES OF INCORPORATION

***for***

LIONSGATE BUSINESS CONSULTING COMPANY

***ID Number:*** 802136307

***received by electronic transmission on*** November 30, 2017 ***, is hereby endorsed.***

***Filed on*** December 13, 2017***, by the Administrator.***

***The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.***

***In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department,*** *in the City of Lansing, this 13th day of December, 2017.*

*Julia Dale, Director*

*Corporations, Securities & Commercial Licensing Bureau*

CSCL/CD-502 (Rev. 01/14)

**MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS**
**CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU**

Date Received

ck 1186 $20

Exhibit C5

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.

FILED
MAY 07 2014
ADMINISTRATOR
CORPORATIONS DIVISION

| Name | | |
|---|---|---|
| Address | | |
| City | State | ZIP Code |

EFFECTIVE DATE:

**Document will be returned to the name and address you enter above.**
**If left blank, document will be returned to the registered office.**

71496H

## ARTICLES OF INCORPORATION
## For use by Domestic Nonprofit Corporations

(Please read information and instructions on the last page)

*Pursuant to the provisions of Act 162, Public Acts of 1982, the undersigned corporation executes the following Articles:*

### ARTICLE I

The name of the corporation is:

My Big Sister's House

### ARTICLE II

The purpose or purposes for which the corporation is organized are:

My Big Sister's House core activities are providing emergency care to battered women and children. The corporation is organized exclusively for charitable, religious and educational purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(C)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

### ARTICLE III

1. The corporation is organized upon a nonstock basis.
(Stock or Nonstock)

2. If organized on a stock basis, the total number of shares which the corporation has authority to issue is __________. If the shares are, or are to be, divided into classes, the designation of each class, the number of shares in each class, and the relative rights, preferences and limitations of the shares of each class are as follows:

## ARTICLE III (cont.)

3. a. If organized on a nonstock basis, the description and value of its real property assets are: (if none, insert "none")

   none

   b. The description and value of its personal property assets are: (if none, insert "none")

   none

   c. The corporation is to be financed under the following general plan:

   The corporation will be funded by donations from churches, funding group, fundraising, etc.

   d. The corporation is organized on a directorship basis.
   (Membership or Directorship)

## ARTICLE IV

1. The name of the resident agent at the registered office is:

   Troi Graham

2. The address of its registered office in Michigan is:

   2000 Town Center Suite 1900 (Street Address), Southfield (City), Michigan 48075 (ZIP Code)

3. The mailing address of the registered office in Michigan if different than above:

   2000 Town Center Suite 1900 (Street Address or PO Box), Southfield (City), Michigan 48075 (ZIP Code)

## ARTICLE V

The name(s) and address(es) of the incorporator(s) is (are) as follows:

| Name | Residence or Business Address |
|---|---|
| Troi Graham | 2000 Town Center Suite 1900 Southfield MI 48075 |

Use space below for additional Articles or for continuation of previous Articles. Please identify any Article being continued or added. Attach additional pages if needed.

Article VI

No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes.

Upon the dissolution of the Corporation, the Board of Directors shall, after paying or adequately providing for all the debts, obligations, and liabilities of the Corporation, distribute the remaining assets of the Corporation exclusively for the nonprofit chartable, education, or religious purposes to such organization or organizations which are tax exempt under section 501 (C)(3) of the Code, as amended, as the Board of Directors in its sole discretion shall determine.

I, (We), the incorporator(s) sign my (our) name(s) this 28 day of January, 2014

Troi Graham

Troi Graham
3829 Roosevelt
Dearborn MI 48124

Jack Brooks Federal Building and
United States Courthouse
300 Willow Street Suite 104
Beaumont, Texas 77701

FedEx

Envelope

Recyc... e

ORIGIN ID:OETA (517) 375-4444
TROI GRAHAM

20049 EVERGREEN MEADOWS RD

SOUTHFIELD, MI 48076
UNITED STATES US

SHIP DATE: 30OCT26
ACTWGT: 0.40 LB
CAD: 6575280/ROSA2710

BILL THIRD PARTY

TO JACK BROOKS FEDERAL BUILDING
UNITED STATES COURTHOUSE
300 WILLOW STREET
SUITE 104
BEAUMONT TX 77701
(999) 999-9999
INV:
PO: REF:
DEPT:

FedEx Express E

RELY# 3785346

TRK# 0201 8794 9911 2844

TUE - 03 NOV 5:00P
** 2DAY **

SS BMNTG

BPTA 77701
TX-US IAH

**CLERK, U.S. DISTRICT COURT**
**RECEIVED**

NOV 0 2 2026

EASTERN DISTRICT OF TEXAS
BEAUMONT, TEXAS